IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| AUSTIN JOSHUA NANCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:22CV20 |
| ) | |
| GREGORY J. SEABOLT, PHILLIP CHEEK, ) | |
| and AUNDREA AZELTON ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff, Austin Joshua Nance, a pretrial detainee in the Randolph County, North Carolina, jail. Plaintiff names as Defendants Gregory J. Seabolt (the Sheriff of Randolph County), Major Phillip Cheek (Jail Administrator), and Colonel Aundrea Azelton. Plaintiff alleges that Defendants violated his First Amendment and Eighth Amendment rights by (1) confiscating his books other than his Bible, and implementing a system where inmates could only receive books from the Jail library or on the Jail tablets, and (2) prohibiting him from receiving a paperback Study Bible from his family but instead providing him with a Bible from the Jail library. Defendants filed a Motion to Dismiss [Doc. #12] pursuant to Federal Rules of Civil Procedure Rule 12(b)(6). Plaintiff Nance filed a response [Doc. #19] to the Motion to Dismiss. For the reasons set out below, the Court recommends that Defendants' Motion to Dismiss be granted.

I.   FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiff's complaint was filed on January 10, 2022, pursuant to 42 U.S.C. § 1983. Plaintiff alleges that on May 21, 2021, several unnamed officers at the Randolph County Jail instructed Plaintiff to leave his cell and confiscated his books except for "one Bible." (Compl. [Doc. #2] at 5.)  Plaintiff further alleges that the Jail restricted the number of Bibles that he could have in his cell and did not allow family members to send religious material to inmates. (Compl. [Doc. #2] at 5-6.)  Plaintiff alleges that the Jail took inmates' "books and Bibles" because "another inmate was smuggling contraband into the facility." (Compl. [Doc. #2] at 5.)  Plaintiff alleges that on November 6, 2021, the Jail started a library with donated books, "but limited inmates to read 1 book per 2 weeks." (Compl. [Doc. #2] at 8.)   Plaintiff alleges that he was denied a NIV Study Bible that his family provided around November 15, 2021. (Compl. [Doc. #2] at 8.)  With respect to Defendant Seabolt, Plaintiff alleges that he is the Sheriff of Randolph County, that he runs the Jail and oversees its rules and policies, and that the Jail's rules and policies "must be approved by him." (Compl. [Doc. #2] at 4-5.)  With respect to Defendant Cheek, Plaintiff alleges that he "runs the Jail for Sheriff Gregory Seabolt," that he creates and enforces Jail rules, and that he prohibited books from inmate family members and only allowed donated and approved books into the facility, including Bibles. (Compl. [Doc. #2] at 5.)[1]   Plaintiff alleges that after all his books were confiscated,

---

[1] Plaintiff initially named Aundrea Azelton as a Defendant, but in his response to Defendants' Motion to Dismiss, Plaintiff concedes that he "has no arguments in the matter of Defendant Aundrea Azelton and is [in] agreement with the defense and would like to drop all claims against Aundrea Azelton in part and find that Phillip Cheek and Gregory Seabolt violated the plaintiff[']s rights." (Pla. Res. Br. [Doc. #19] at 18.) Accordingly, any claims against Defendant Aundrea Azelton should be dismissed.

2

two months passed before Defendant Cheek allowed inmates to access donated books. (Compl. [Doc. #2] at 5.)

Plaintiff contends that confiscating his books and restricting his access to books, including the study Bible provided by his family, violated his "First Amendment right to receive information and ideas," that these actions were punishments, and that the policies left him without an "adequate way to study or practice" his religion. (Compl. [Doc. #2] at 5, 6.) Plaintiff sues each of the Defendants in their individual and official capacities. Plaintiff alleges that the restrictions at the Jail caused him "extensive mental and emotional" damage from idleness that was exacerbated over time. Plaintiff seeks $250,000.00 in compensation for his allegedly extensive mental and emotional damages caused by forced idleness. (Compl. [Doc. #2] at 7.)

II. DISCUSSION

a. Standard

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), contending that Plaintiff has failed to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 500 U.S. 544, 570 (2007)). This standard does not require "detailed factual allegations," but it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. A claim is facially plausible when the plaintiff provides enough factual content to enable the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. "The plausibility standard is not akin to a

3

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In this way, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[ ] the[ ] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. The Court must accept as true all of the factual allegations contained in a complaint, but is not bound to accept legal conclusions. Iqbal, 556 U.S. at 678. Thus, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

    b. Plaintiff's Failure to Exhaust Administrative Remedies

In the Motion to Dismiss, Defendants first contend that Plaintiff failed to properly exhaust his administrative remedies. To establish exhaustion of his administrative remedies, Plaintiff alleges that he filed grievances about these alleged violations of his constitutional rights. (Compl. [Doc. #2] at 10.) At the time Plaintiff filed the Complaint, he noted that he was "still waiting for a response on a grievance" and that "some of my grievance[s] don't have appeals because they don't give you [an] option on the kiosk to Appeal," so Plaintiff filed an additional grievance and labeled it "Appeal" and escalated the grievance to Defendant Azelton. (Compl. [Doc. #2] at 10-11.)

Under the Prison Litigation Reform Act of 1995 (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and

4

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In this way, Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[ ] the[ ] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. The Court must accept as true all of the factual allegations contained in a complaint, but is not bound to accept legal conclusions. Iqbal, 556 U.S. at 678. Thus, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

    b. Plaintiff's Failure to Exhaust Administrative Remedies

In the Motion to Dismiss, Defendants first contend that Plaintiff failed to properly exhaust his administrative remedies. To establish exhaustion of his administrative remedies, Plaintiff alleges that he filed grievances about these alleged violations of his constitutional rights. (Compl. [Doc. #2] at 10.) At the time Plaintiff filed the Complaint, he noted that he was "still waiting for a response on a grievance" and that "some of my grievance[s] don't have appeals because they don't give you [an] option on the kiosk to Appeal," so Plaintiff filed an additional grievance and labeled it "Appeal" and escalated the grievance to Defendant Azelton. (Compl. [Doc. #2] at 10-11.)

Under the Prison Litigation Reform Act of 1995 (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and

4

the Court cannot waive that requirement. Porter v. Nussle, 534 U.S. 516, 524 (2002). Nevertheless, lack of exhaustion is an affirmative defense, Jones v. Bock, 549 U.S. 199, 216 (2007), which means it must be proved by Defendant. However, if Plaintiff responds to that defense by claiming that administrative remedies were not "available," he must "show that a grievance procedure was not 'available,'" by "adduc[ing] facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." Graham v. Gentry, 413 F. App'x. 660, 663 (4th Cir. 2011).

In this case, Plaintiff acknowledges that a grievance concerning the facts alleged in the Complaint was pending at the time he filed the Complaint. (Compl. [Doc. #2] at 10.) In addition, in his Response Brief, Plaintiff confirms that he did not fully complete the appeal process until he appealed his grievance on February 9, 2022, and the appeal was denied on March 18, 2022, after the Complaint had already been filed on January 10, 2021. See Sherron v. Ishee, 2021 WL 2446179 (E.D.N.C. June 14, 2021) ("Plaintiff may not avoid the PLRA's exhaustion requirement by exhausting administrative remedies after filing or by amending the complaint to show exhaustion while the action is pending." (collecting cases)). However, Plaintiff also alleges that he was not given the option to appeal his earlier grievances, and he contends that he exhausted all grievance options available at the time prior to filing suit. Given these allegations and the potential dispute on this point, the Court has considered Defendant's alternative contentions set out in the Motion to Dismiss and concludes that Plaintiff's claims fail even if they had been fully exhausted, as set out below.

5

### c. Failure to State a First Amendment Violation

Plaintiff alleges that Defendants violated his First Amendment rights. Specifically, Plaintiff alleges that confiscating his books and restricting his access to books violated his "First Amendment right to receive information and ideas" and left him without an "adequate way to study or practice" his religion. (Compl. [Doc. #2] at 5, 6.) Plaintiff alleges that these actions were taken because "another inmate was smuggling contraband into the facility" (Compl. [Doc. #2] at 5.) Plaintiff appears to allege violations of his First Amendment rights to free speech (information and ideas) and the free exercise clause. Before addressing each First Amendment claim separately, the court will outline the legal standards that apply to both claims.

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Roberts v. Perry, No. 1:16-CV-385-FDW, 2018 WL 1278205, at *4 (W.D.N.C. Mar. 12, 2018). Prison restrictions alleged to infringe upon an inmate's First Amendment rights "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). To determine the reasonableness of the prison restriction or regulation the court considers several factors: (1) whether there is a valid, rational connection between the prison regulation and the legitimate government interest put forth to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodating the right will have on guards and other inmates; and (4) the absence of ready alternatives. Turner v. Safley, 482 U.S. 78, 89-91 (1987). "Applying these factors also requires . . . substantial deference to prison

6

officials, especially when it comes to the third factor, the impact on guards, inmates, and resource allocation. The difficulties of operating a detention center must not be underestimated by the courts." Firewalker-Fields v. Lee, 58 F.4th 104, 115 (4th Cir. 2023) (internal quotations marks and citations omitted). This deference is particularly warranted in jails. "Especially when dealing with jails, which generally have greater churn than prisons, officials must have substantial discretion to devise reasonable solutions to the problems they face. The burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Id. (internal quotations marks and citations omitted).

i. Free Speech: Right to Information and Ideas

Plaintiff alleges that confiscating his books and restricting his access to books violated his "First Amendment right to receive information and ideas" (Compl. [Doc. #2] at 5.) The First Amendment of the Constitution "'protects the right to receive information and ideas' from a willing speaker." Stephens v. Cnty. of Albemarle, VA, 524 F.3d 485, 491 (4th Cir. 2008) (quoting Stanley v. Georgia, 394 U.S. 557, 564 (1969)). In applying the Turner factors to the facts alleged it is clear that there was a valid, rational connection between the confiscating of Plaintiff's books and restricting his access to reading materials and the penological interest in preventing contraband from entering the jail, which Plaintiff highlights in the Complaint. Furthermore, Plaintiff had alternative means of exercising the right. Although his other books were confiscated, one Bible was left in his cell, and Plaintiff alleges that about two months later, the Jail started receiving donated reading materials for the inmates, and that in November 2021, the Jail started a library. In addition, in his Response Brief, Plaintiff notes that the Jail provided inmates access to tablets for reading books from

7

10:00 am to 3:00 pm and 6:30 pm to 9:30 pm. In light of Plaintiff's allegations, with respect to the first and second Turner factors, the Jail's policy was rationally related to a legitimate government interest in safety and security, and the Jail provided Plaintiff with alternative means to exercising his right to information and ideas. See Temple v. Oconee Cnty., No. CA 6:13-144-JFA-KFM, 2014 WL 4417702, at *5 (D.S.C. Sept. 8, 2014), aff'd, 595 F. App'x 246 (4th Cir. 2015) (finding a rational connection between a restriction on reading materials and the legitimate governmental interest in institutional safety and security, and finding that facility provided an alternative means of exercising First Amendment right where the jail provided legal materials through an institutional law library); McCormick v. Reinkey, No. 1:21-CV-00454-DCN, 2022 WL 1422925, at *4 (D. Idaho May 5, 2022) ("Prohibiting books being sent directly to inmates, but instead requiring them to be sent to the jail library, is reasonably related to the legitimate—indeed, the compelling—interest in jail security and safety."); Prison Legal News v. Cty. of Bernalillo, No. 15-CV-107 JAP/KBM, 2015 WL 13662872, at *3 (D.N.M. June 16, 2015) (unpublished) (finding that an institutional policy prohibiting inmates from receiving books directly through the mail satisfied the Turner analysis because the policy was rationally related to legitimate penological interests in safety and security, as books can be used to "smuggle contraband" and are "hard to search effectively."). Plaintiff complains that the Jail's library system limited Plaintiff to reading one book every two weeks, (Compl. [Doc. #2] at 8), and he complained that the tablets with additional books were only available 8 hours each day, but it is clear that the library system and tablets provided Plaintiff with an alternative means of exercising his First Amendment right. See Hause v. Vaught, 993 F.2d 1079 (4th Cir. 1993) (upholding detention center ban on outside publications as reasonably related to the

objective of preventing smuggling and fires, and rejecting the assertion that the detention center was required to adopt an alternative allowing detainees to order directly from publishers, since detainees had access to newspapers, television, and a limited library, and the "court will not second-guess prison officials' regulatory choices"); Roberts v. Perry, 2018 WL 1278205, at *5 (dismissing prisoner's First Amendment claim alleging that prison confiscated books and withheld mailed religious and political material where plaintiff failed to allege there was no rational connection between the jail's policy and a legitimate governmental interest, or that he did not have any other means of exercising his right). Plaintiff has not plausibly alleged that the Jail's policy was not rationally related to a legitimate government interest in safety and security, and his allegations reflect that he was provided with alternative means to exercising his right to information and ideas. Therefore, Plaintiff has failed to state a First Amendment free speech violation.

    ii. Free Exercise of Religion

  Plaintiff also claims that the Jail policy restricting his access to books, specifically denying him access to an NIV Study Bible provided for him by his family, deprived him of an "adequate way to study or practice" his religion. (Compl. [Doc. #2] at 6, 8.) The Constitution establishes that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. To make a Free Exercise claim, a prisoner must first show as a threshold matter that a prison practice or regulation violates his Free Exercise rights and then show that the prison's policies are not "reasonably related to legitimate penological interests." Firewalker-Fields, 58 F.4th at 114 (quoting Ali v. Dixon, 912 F.2d 86, 89 (4th Cir. 1990) (citing Turner, 482 U.S. at 89)). To meet the threshold showing that a prison practice or regulation

9

violates his Free Exercise rights, a prisoner must show (1) that he holds a sincere religious belief and (2) that his religious practice has been substantially burdened by the prison policy or regulation. Id. If that threshold showing is made, the prisoner must then show that the practice or regulation is not "reasonably related to legitimate penological interests." Id. (quoting Turner, 482 U.S. at 89) (internal quotation mark omitted)).

In this case, Plaintiff's claim fails at both steps of the analysis. The Court assumes that Plaintiff holds a sincere religious belief, but even assuming this, Plaintiff has not plausibly alleged that his religious practice has been substantially burdened by the Jail policy. In the Complaint, Plaintiff alleges that because of the policy he was only allowed one Bible in his cell and was denied a NIV Study Bible provided for him by his family, which deprived him of an "adequate way to study or practice" his religion. (Compl. [Doc. #2] at 5, 6.) In his Response Brief, he notes that the Jail provided him with a Life Recovery Bible and an NIV Bible, and he acknowledges that the NIV Bible was the same translation as the NIV Study Bible from his family that he was denied. (Pl. Resp. [Doc. #19] at 12-13.) By his own allegations, Plaintiff had opportunity to exercise his faith. Not having access to a specific study Bible does not constitute a substantial burden on Plaintiff's religious practice. Van Wyhe v. Reisch, 581 F.3d 639, 657-58 (8th Cir. 2009) (finding that religious practice was not burdened where prison permitted the inmate a reasonable opportunity to engage in religious activities even though the inmate was not permitted to access certain religious material).

Further, if Plaintiff could make that threshold showing, he has not plausibly alleged an unreasonable action under the Turner factors. As discussed above, Plaintiff alleges that the limitation on books and materials coming from friends and family was specifically adopted in

10

response to other inmates smuggling contraband into the facility, which reflects a rational connection to a legitimate penological interest. In addition, the allegations in the Complaint reflect alternative options that remained open. As the Fourth Circuit has noted, "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." Firewalker-Fields, 58 F.4th at 116-17 (internal quotation marks and citations omitted). The Seventh Circuit specifically considered a similar case, in which an inmate challenged a prison policy prohibiting inmates from retaining personal reading materials, which resulted in the confiscation of the inmate's NIV Study Bible. See Tarpley v. Allen Cnty., Indiana, 312 F.3d 895, 897 (7th Cir. 2002). In Tarpley, the jail provided the inmate with an NIV Bible that did not include the interpretive commentary, but refused the inmate's repeated requests for return of his NIV Study Bible based on their general policy. Id. The Seventh Circuit found that the general policy was rationally related to the general interest in maintaining safe conditions, and further found that alternative means of exercising the right remained open to the inmate:

> the jail furnished Tarpley with alternative reading materials—indeed, the very version of the Bible he wanted—even though it was not a perfect substitute because it lacked the commentary. Although Tarpley declared under oath that the commentary was important to him because it enabled him to gain a greater understanding of "God's word," the same could be said about almost any part of the vast literature that explicates Biblical text. Tarpley has not asserted that the commentary furnished with the NIV Bible has the status of something like the Jewish Talmud—non–Biblical writings that have become part of the fundamental texts of the religion as a whole. We therefore have no occasion to decide what beyond the Bible the prison officials had to provide to him. Prisons are only required to make reasonable efforts to provide an opportunity for religious practice. See Alston v. DeBruyn, 13 F.3d 1036, 1039-40 (7th Cir.1994). Under the circumstances here, giving Tarpley a copy of the NIV Bible that he could use in his cell offered him the essential material for his religious studies.

11

Tarpley, 312 F.3d 898-99; see also Wisniewski v. Mueller, No. 2:12-CV-1230-MGL-BHH, 2013 WL 625365, at *6 (D.S.C. Jan. 2, 2013) (finding the Turner factors satisfied and that the pretrial detainee had alternative means of practicing his religion where jail permitted him to have a Bible in his cell but did not allow access to mailed books and magazines since all books and magazines were distributed and accessed through the detention center).

Furthermore, "[w]here there will be a significant ripple effect from a potential accommodation, courts should be particularly deferential." Firewalker-Fields, 58 F.4th at 117 (internal quotation marks and citations omitted). In considering the third Turner factor, accommodating every inmate's request for a specific study guide would be unrealistic, impact the guards, and would conflict with the central objective of prison administration, safeguarding institutional security. Savko v. Rollins, 749 F. Supp. 1403, 1409 (D. Md. 1990), aff'd sub nom. Simmons v. Rollins, 924 F.2d 1053 (4th Cir. 1991) (finding that a "limitation on the amount of in-cell religious reading material . . . is constitutional under the Turner standards" based on legitimate interests in fire safety and prison security); see also Tarpley, 312 F.3d at 899 ("With respect to the third and fourth factors, once again Tarpley cannot show that the jail's policy was constitutionally flawed. There was no way that the jail could allow Tarpley to keep a personal book without compromising its general policy . . .").

In this case, under the Jail policy as alleged by Plaintiff, Plaintiff retained access to two different Bibles, including an NIV Bible which was the translation he requested. Plaintiff's allegations do not plausibly support a claim that the Jail's general policy with respect to reading materials, as applied here, unreasonably failed to accommodate his religious needs. Therefore, Plaintiff has failed to state a First Amendment free exercise violation.

12

d. Failure to State an Eighth or Fourteenth Amendment Violation

Plaintiff also alleges that Defendants violated his Eighth Amendment rights. Specifically, Plaintiff alleges that confiscating his books and restricting his access to books constituted punishment. (Compl. [Doc. #2] at 5.) Plaintiff alleges that the Jail took his "books and Bibles" because "another inmate was smuggling contraband into the facility," but that he "was not charged" with smuggling contraband and "should not have been punished for it." (Compl. [Doc. #2] at 5.)

Confinement conditions of pretrial detainees are evaluated under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment prohibition against cruel and unusual punishment. Bell v. Wolfish, 441 U.S. 520, 535-36 (1979). "By definition, pretrial detainees have not been convicted of the crimes with which they are charged. For that reason, the Supreme Court held in Bell v. Wolfish, they retain a liberty interest in freedom from 'punishment,' even while they are detained to ensure their presence at trial." Dilworth v. Adams, 841 F.3d 246, 251 (4th Cir. 2016).

> "[I]n determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word[,] . . . [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from

13

constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility."

Bell, 441 U.S. at 538-39 (internal quotations and citations omitted).

Thus, "[t]o establish that a particular condition or restriction of his confinement is constitutionally impermissible "punishment," the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). Plaintiff has not plausibly alleged sufficient facts to show that confiscation of his books and the restrictions on his access to reading material were imposed with an expressed intent to punish or even that they were punishments of any sort. Plaintiff specifically alleges that the restrictions were implemented because "another inmate was smuggling contraband into the facility" (Compl. [Doc. #2] at 5.) Plaintiff has also failed to plausibly allege sufficient facts to show that the actions alleged in the Complaint were not reasonably related to a legitimate nonpunitive governmental objective. Courts consistently find that policies aimed at preventing contraband from entering and circulating in prisons is a legitimate nonpunitive governmental objective. Therefore, Plaintiff has failed to plausibly allege that the restrictions in the Jail amount to punishment and has failed to state a claim for violation of the Fourteenth Amendment.

Because Plaintiff has not stated a First, Eighth, or Fourteenth Amendment violation, Plaintiff's § 1983 action should be dismissed.[2]

---

[2] The Court notes that both Parties submitted materials beyond what could ordinarily be considered on a motion to dismiss. The Court has addressed the Motion to Dismiss above based solely on the Complaint and the briefing, and without consideration of the additional documents. However, to the extent that the submission of additional materials by both Parties could be viewed as a joint request to treat the motion as a motion for summary judgment pursuant to Rule 12(d), or a request by Plaintiff to supplement the Complaint

14

e. Qualified Immunity

Finally, to the extent that there could be a constitutional violation, Defendants argue that they are entitled to qualified immunity. A court generally considers first in the qualified immunity analysis whether a constitutional violation has occurred. Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013). The above discussion concludes that Plaintiff has not established a constitutional violation. However, if there were a constitutional violation, the Court next considers "whether the right violated was clearly established at the time of the official's conduct." Id.

> [Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.' Saucier v. Katz, 533 U.S., at

---

to include the information in his attachments, the result would not change even if those documents were considered. Defendants' filing included a declaration of Defendant Cheek attaching Jail rules and procedures, copies of Plaintiff's grievances, and copies of Plaintiff's library book requests and courses taken on the tablets [Doc #13-1]. Plaintiff was given Notice [Doc. #14] and subsequently filed his Response to the Motion to Dismiss with declarations from other inmates, copies of his grievances, and Jail rules and other records [Doc. #19]. These records reflect that the Jail offered reading materials through a book cart after inmate books were confiscated, and reflect that Plaintiff made requests and accessed reading materials through that system. (Cheek Decl. [Doc. #13-1] (citing Attach. D).) The records reflect that the Jail also made books and courses available on the electronic tablets that inmates could access, and Plaintiff took 839 courses through the electronic library between November 10, 2020, and June 1, 2022, which includes the time when Plaintiff's books were confiscated. (Cheek Decl. (citing Attach. E.) With his Response Brief, Plaintiff submitted a copy of the Inmate Rules reflecting that "Inmates are allowed two books at a time in their possession," that "the Library will donate books to the facility," that "Family members and or Friends cannot send books into the facility," and that "Bibles will be provided by the Jail or approved sources only. No family members or friends." (Pl. Resp. Att. B, C.) Plaintiff also attached copies of his grievances, which reflect that when Plaintiff complained about the confiscation of the books, the Jail told Plaintiff they were working with the local public library to set up an inmate library, that Plaintiff was later informed that the Jail had obtained book donations from the Friends of the Randolph County Library to set up the inmate library, and that Plaintiff was also informed that books would also still be available on the tablets provided by the detention center. (Pl. Resp. Att. A.) Plaintiff's attachments also include his grievances acknowledging that inmates could take "2 books bi-weekly" from the library, and acknowledging that the tablets had 33,048 books, and complaining that only 556 were modern titles and "the rest of the books are all classics." (Pl. Resp. Att. A.) Plaintiff also submitted declarations from two other inmates, in Plaintiff's handwriting but signed by the other inmates, corroborating the Jail's confiscation of inmates' books and the system for borrowing books that was subsequently implemented. (Pl. Resp. Ex A, B.) Even if the Court had considered this information, these additional allegations and documents would not affect the conclusion set out above, and even if considered as a joint request to convert the Motion to Dismiss into a motion for summary judgment, would not create a genuine issue of material fact with respect to the allegations that Plaintiff's constitutional rights were violated.

15

206, 121 S. Ct. 2151. For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth, 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'"

Hope v. Pelzer, 536 U.S. 730, 739 (2002).

Here, the pleadings reflect that the alleged constitutional violations can be summarized as confiscating Plaintiff's books except his Bible and restricting access to additional reading materials from outside sources pursuant to a facility-wide policy after other inmates were smuggling contraband into the facility, but with alternatives provided including tablets and a Jail library. Under these circumstances and in light of the findings and cases cited above, the Court concludes that it would not be clear to a reasonable officer that this conduct violated a clearly established right. Therefore, even if Plaintiff had plausibly alleged a constitutional violation, Defendants would still be entitled to qualified immunity, and this case should be dismissed.

f. Claims Under the North Carolina Constitution

In addition to Plaintiff's claims under the United States Constitution, Plaintiff also attempts to raise claims under the North Carolina Constitution against Defendants in their individual and official capacities. Plaintiff claims that the same conduct mentioned above also violated "Article 1 Section 13 Religious Liberty" and "Article IX Section 1 Education" of the North Carolina Constitution. (Compl. [Doc. #2] at 3). The Court has discretion whether to exercise supplemental jurisdiction over these state law claims. Here, the scope of the state law claims, the evidence required to support those claims, and the immunity defenses to those

16

Case 1:22-cv-00020-WO-JEP  Document 22  Filed 03/01/23  Page 16 of 17

claims would all raise state law issues best addressed by the North Carolina courts. In light of the recommendation that the federal claims be dismissed for the reasons set out above, the Court recommends that any remaining state claims be dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

III.  CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants Motion to Dismiss [Doc. #12] be granted and that this case be dismissed.

This, the 1st day of March, 2023.

/s/ Joi Elizabeth Peake  
United States Magistrate Judge